**KAPLAN FOX & KILSHEIMER LLP**
Matthew B. George (SBN 239322)
Blair E. Reed (SBN 316791)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
Email: *mgeorge@kaplanfox.com*
      *breed@kaplanfox.com*

[Additional Counsel Listed on Signature Page]

*Attorneys for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAEL FIERRO and PATRICK THURBER, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:24-cv-00449 |
| Plaintiffs, | **CLASS ACTION** |
| v. | **CLASS ACTION COMPLAINT** |
| NATIONAL ASSOCIATION OF REALTORS, THE AGENCY REAL ESTATE FRANCHISING, LLC, COMPASS, INC., EXP WORLD HOLDINGS, INC., EXP REALTY OF CALIFORNIA, INC., EXP REALTY OF SOUTHERN CALIFORNIA, INC., EXP REALTY OF GREATER LOS ANGELES, INC., EXP REALTY OF NORTHERN CALIFORNIA, INC., BERKSHIRE HATHAWAY, INC., BHH AFFILIATES, LLC, FIRST TEAM REAL ESTATE – ORANGE COUNTY, RODEO REALTY, INC., PINNACLE ESTATE PROPERTIES, INC., CALIFORNIA REGIONAL MULTIPLE LISTING SERVICE, INC., COMBINED L.A./WESTSIDE MLS, INC., CALIFORNIA ASSOCIATION OF REALTORS, INC., GREATER LOS ANGELES REALTORS, INC., ARCADIA ASSOCIATION OF REALTORS, INCORPORATED, BURBANK | **DEMAND FOR JURY TRIAL** |

1    ASSOCIATION OF REALTORS,
CITRUS VALLEY ASSOCIATION

2    OF REALTORS, INC., GLENDALE
ASSOCIATION OF REALTORS,

3    INGLEWOOD BOARD OF
REALTORS, INC., MONTEBELLO

4    DISTRICT ASSOCIATION OF
REALTORS, INC., PALOS VERDES

5    PENINSULA ASSOCIATION OF
REALTORS, PASADENA-

6    FOOTHILLS ASSOCIATION OF
REALTORS, RANCHO SOUTHEAST

7    REALTORS, SOUTH BAY
ASSOCIATION OF REALTORS,

8    INC., SOUTHLAND REGIONAL
ASSOCIATION OF REALTORS,

9    INC., TRI-COUNTIES
ASSOCIATION OF REALTORS,

10    WEST SAN GABRIEL VALLEY
REALTORS, MALIBU

11    ASSOCIATION OF REALTORS,
INC., MADERA ASSOCIATION OF

12    REALTORS, FRESNO BOARD OF
REALTORS, INCORPORATED,

13    MERCED COUNTY ASSOCIATION
OF REALTORS, INC., and

14    MARIPOSA COUNTY BOARD OF
REALTORS, INC.,

15

16       Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

Gael Fierro and Patrick Thurber (collectively, "Plaintiffs"), bring this action on behalf of themselves and on behalf of the Classes consisting of all persons who listed properties on a Multiple Listing Service in the Madera, Fresno, and Los Angeles Counties in California using a listing agent or broker affiliated with one of the Defendants named herein and paid a buyer broker commission from four years prior to the filing of this complaint, until the present ("the Class Period"). In support thereof, Plaintiffs respectfully allege as follows:

## NATURE OF THE LAWSUIT

1.     Plaintiffs and Class members allege that during the Class Period, Defendants have engaged or collaborated in anticompetitive practices. This conspiracy centers around the enforcement of an anticompetitive restraint that compels home sellers to provide an inflated fee to the broker representing the buyer of their properties, thus violating federal and state antitrust regulations.

2.     The creator of the conspiracy is the National Association of Realtors ("NAR"), a trade association for real estate brokers with over 1.5 million individual members. NAR conspired with its largest affiliated associations in California and some of the largest real estate brokerages that worked in California during the Class Period.

3.     Defendants include NAR, and the following brokerages: The Agency Real Estate Franchising, LLC, ("The Agency"), Compass, Inc. ("Compass"), eXp World Holdings, Inc. ("eXp"), eXp Realty of California, Inc. ("eXp California"), eXp Realty of Southern California, Inc. ("eXp SoCal"), eXp Realty of Greater Los Angeles, Inc. ("eXp Los Angeles"), eXp Realty of Northern California, Inc. ("eXp NorCal"), Berkshire Hathaway, Inc. ("Berkshire Hathaway"), BHH Affiliates, LLC ("BHHS"),  First Team Real Estate – Orange County ("First Team"), Rodeo Realty, Inc. ("Rodeo Realty"), and Pinnacle Estate Properties, Inc. ("Pinnacle") (the "Broker

Defendants")[1]. Also included are the named regional Realtor associations and multiple listing services ("MLS").

4.     An MLS is a database and platform used by real estate agents and brokers to share information about properties for sale and find available listings for prospective buyers.

5.     MLSs act as reservoirs of property listings available for sale in defined geographic regions, and thus play a pivotal role in the real estate ecosystem. Most homes in the United States are traded through MLS platforms, where brokers are often obligated to include all properties. These MLSs are primarily governed by local NAR associations, and access is granted contingent upon broker compliance with NAR's mandatory regulations outlined in the Handbook on Multiple Listing Policy. This handbook explicitly incorporates the Mandatory Offer of Compensation Rule, which require all home sellers to agree to make a blanket, unilateral and effectively non-negotiable offer of buyer broker compensation when listing a property.

**A.     <u>NAR's Regulatory Dominion and Mandatory Offer of Compensation Rule</u>**

6.     NAR, an organization with considerable influence in shaping the real estate landscape, is at the core of the conspiracy.

7.     NAR wields its regulatory authority to impose a rule known as the "Mandatory Offer of Compensation Rule." This rule dictates that every property seller, when listing their home on an MLS affiliated with a local NAR association, must make a sweeping, non-negotiable offer of compensation to buyer brokers. The Defendants, acting in concert with NAR, pressurize or incentivize their franchisees, brokers, and agents to become NAR members and adhere to its regulatory regime. Through this concerted effort, they ensure the implementation and enforcement of

---

[1] Plaintiffs also allege that real estate brokerages Anywhere Real Estate, Inc. (f/k/a Realogy Holdings Corp.) ("Anywhere") and RE/MAX LLC ("RE/MAX"), along with their subsidiaries would be named as defendants in this Complaint, but for the recently approved settlement in *Sitzer et al v. National Association of Realtors et al*, Case No. 4:19-cv-00332-SRB (W.D. Mo.). *See* November 20, 2023 Order Approving Plaintiffs' Motion for Preliminary Settlements, Dkt. No. 11321.

the Mandatory Offer of Compensation Rule.

### B.   Stifling Competitive Markets

8.    In many MLSs, NAR compels broker compliance with rules that curtail competition. Furthermore, each Defendant mandates or encourages their franchisees, brokerages, and individual realtors to join NAR and implement its anticompetitive regulations, including the Mandatory Offer of Compensation Rule, as a prerequisite for enjoying the benefits of Defendants' branding, brokerage support, and other resources.

9.    As prominent brokers in California, their involvement in the alleged conspiracy, manifested through the implementation and enforcement of its rules and policies, is indispensable to the conspiracy's prosperity.

10.    These anticompetitive measures favor the Defendants by enabling brokers to impose charges on home sellers beyond competitive thresholds and thwarting competition from innovative or lower-cost alternatives.

### C.   Home Seller Burden

11.    The alleged conspiracy compels home sellers to bear a cost that, in a competitive market and in the absence of the Defendants' anticompetitive restraint, would typically be borne by the homebuyer.

12.    Further, this has led to an industry-recognized practice called "steering," where homeowners are pressured into accepting inflated or stabilized rates out of fear that buyer brokers will not show their home to prospective buyers.

### D.   Competitive Imbalance

13.    In the absence of NAR's Mandatory Offer of Compensation Rule, the expense of buyer broker commissions would be incurred by the clients (homebuyers). This would lead to competition among buyer brokers to offer lower commission rates.

14.    Consequently, the Mandatory Offer of Compensation Rule stifles price competition among buyer brokers because the actual party retaining the buyer

broker—the homebuyer—doesn't negotiate or pay the commission for their broker.

E. **Anticompetitive Effects**

15.    Adding to the anticompetitive implications of the Mandatory Offer of Compensation Rule, NAR's rules also forbid buyer brokers from making home purchase offers that hinge on reducing the buyer broker's commission.

16.    The conspiracy has led to various illogical, harmful, and anticompetitive effects, including: (a) requiring sellers to pay overcharges for services provided by buyer brokers to the buyer; (b) maintaining, fixing, and stabilizing buyer broker compensation at levels that would not exist in a competitive market; and (c) promoting steering and actions that hinder innovation and entry by new, lower-cost real estate brokerage service providers.

17.    In competitive overseas markets, when homebuyers opt to use a broker, they personally cover the cost, which is less than half of what American buyer brokers receive.

18.    As a result, Defendants' conspiracy has inflated and stabilized buyer broker commissions, resulting in higher total commissions paid by home sellers like Plaintiffs and Class members. Plaintiffs and Class members have each incurred, on average, thousands of dollars in overcharges and damages due to Defendants' alleged conspiracy.

F. **Defendants' Alleged Roles**

19.    Defendants leverage their control over MLSs, their agreements with local franchisees and agents, their employee policies, and their active roles within NAR and local realtor associations to compel local residential real estate brokers to comply with NAR's regulations, including the Mandatory Offer of Compensation Rule.

20.    Defendants also play a part in implementing the conspiracy by reviewing NAR's Rules and consenting to them at annual meetings, and NAR perpetuates the conspiracy by periodically reissuing its Rules, which include the

Mandatory Offer of Compensation Rule. Additionally, Defendants are involved in the conspiracy by serving on boards and committees that oversee compliance with NAR Rules.

21.    Plaintiffs, on behalf of themselves and the Class, bring this lawsuit against Defendants for alleged violations of federal and state antitrust laws, seeking treble damages, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from Defendants. Subject matter jurisdiction over this action also exists under 15 U.S.C. § 4 and under 28 U.S.C. §§ 1331, 1337.

23.    This Court has personal jurisdiction over Defendants. They have: (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

24.    Each Defendant has received revenue attributable to business transacted in California and in this District from the brokerage operations of their respective subsidiaries, franchisees, affiliates, and/or transaction counterparts that transact business in California and in this District.

25.    Venue is proper in this District under 15 U.S.C. § 22 and under 28 U.S.C. §1391 because Defendants do substantial business in this District, have intentionally availed themselves of the laws and markets within this District, a substantial part of the events giving rise to Plaintiffs' claims arose in this District, and a substantial portion of the affected interstate trade and commerce described

herein has been carried out in this District.

26.     The Mandatory Offer of Compensation Rule and other anticompetitive rules promulgated by NAR have been extended and enforced by Defendants and their co-conspirators in interstate commerce, including this District. These rules govern local NAR associations, local brokers, and local sales agents across the entire nation. Defendants' conduct, as alleged, has led to the inflation of buyer broker commissions nationwide, causing harm to home sellers in numerous regions. Through Defendants, other NAR members, and additional co-conspirators, NAR conducts business in interstate commerce, engaging in activities that substantially impact interstate trade within the United States.

## PARTIES

### A.     Plaintiffs

27.     Plaintiff Gael Fierro is a French national and permanent resident of Los Angeles, California. In December 2020, Plaintiff sold his Los Angeles property. Plaintiff used Aspire Los Angeles as the listing agent, and The Agency was the selling agent. Plaintiff paid a $25,650.00 commission to the listing agent, or 3% of the sale price, and a $25,650.00 commission to the buyer's agent, or 3% of the sale price, for a grand total of $51,300.00.

28.     Plaintiff Patrick Thurber was a resident of North Folk, California and is now a citizen and resident of Illinois. In July 2022, Plaintiff sold his Madera County property. Plaintiff used Century 21 Ditton Realty as the listing agent, and Stars and Stripes Real Estate was the selling agent. Plaintiff paid a $13,500.00 commission to the listing agent, or 3% of the sale price, and a $13,500.00 commission to the buyer's agent, or 3% of the sale price, for a grand total of $27,000.

### B.     Defendants

29.     National Association of Realtors ("NAR"), is a lobbying group that advocates for the interests of real estate brokers, has over 1.5 million individual members from whom it has collected hundreds of millions of dollars in dues and

membership fees, including millions of dollars in dues and membership fees from NAR members located in this District. NAR oversees state and territorial realtor associations as well as over 1,200 local realtor associations. NAR is headquartered in Chicago, Illinois.

*Broker Defendants*

30. The Agency Real Estate Franchising, LLC, is globally recognized boutique real estate brokerage. The Agency is a Delaware company with its headquarters in Beverly Hills, California. The Agency conducts significant business throughout the United States and has at least one office in this District.

31. Compass, Inc. is a publicly traded company incorporated in Delaware with its principal place of business in New York. Compass states that is the largest independent real estate brokerage by gross transaction value. Compass transacts significant business throughout the United States and has at least one office in this District.

32. eXp World Holdings, Inc. is a publicly traded company incorporated in Delaware with its principal place of business in Bellingham, Washington. Upon information and belief, eXp offers most of its real estate brokerage services through the name eXp Realty and its regional subsidiaries, including eXp California, eXp SoCal, eXp NorCal, and eXp Los Angeles. eXp has brokerages throughout the United States and at least one office in this District. eXp transacts significant business throughout the United States and has at least one office in this District.

33. eXp Realty of California, Inc. is a Washington corporation with its principal place of business in Bellingham, Washington. eXp California transacts significant business throughout the United States and this District.

34. eXp Realty of Southern California, Inc. is a Delaware corporation with its principal place of business in San Diego, California. eXp SoCal transacts significant business throughout the United States and this District.

35. eXp Realty of Greater Los Angeles, Inc. is a Delaware corporation with

1   its principal place of business in Burbank, California. eXp Los Angeles transacts
2   significant business throughout the United States and this District.

3        36.    eXp Realty of Northern California, Inc. is a Delaware corporation with
4   its principal place of business in Roseville California. eXp NorCal transacts
5   significant business throughout the United States and California.

6        37.    Berkshire Hathaway, Inc. is a publicly traded company incorporated in
7   Delaware, with its headquarters in Nebraska. Upon information and belief, Berkshire
8   Hathaway offers its real estate brokerage services through its subsidiary, BHHS.
9   Berkshire Hathaway transacts significant business throughout the United States and
10  has at least one office in this District.

11       38.    BHH Affiliates, LLC, operates as Berkshire Hathaway Home Services
12  and is a Delaware corporation with headquarters in Irvine, California. BHHS
13  transacts significant business throughout the United States and this District.

14       39.    First Team Real Estate – Orange County has been trusted to represent
15  over 250,000 home buyers and sellers as the largest privately held family-owned
16  company in Southern California. First Team is a California corporation with its
17  headquarters in California. First Team transacts significant business throughout
18  California and this District.

19       40.    Rodeo Realty, Inc. is a California corporation with its headquarters in
20  Beverly Hills, California. Rodeo Realty states that is a residential real estate firm that
21  has more than 1,200 licensed agents and brokers and 12 offices throughout Los
22  Angeles and Ventura counties. Rodeo Realty transacts significant business
23  throughout California and this District.

24       41.    Pinnacle Estate Properties, Inc. reports that it is the largest independent
25  real estate firm with the most units sold in Los Angeles County. Pinnacle is a
26  California corporation with its headquarters in Porter Ranch, California. Pinnacle
27  transacts significant business throughout California and this District.

28

1

*Regional Association and MLS Defendants*

2      42.   California Regional Multiple Listing Service, Inc. ("CRMLS") states
3 that it is the nation's largest and most recognized subscriber-based multiple listing
4 service. CRMLS states that it serves more than 110,000 real estate professionals from
5 41 Associations, Boards, and MLS organizations, including those in this District.
6 CRMLS is a California nonprofit mutual benefit corporation headquartered in Chino
7 Hills, California.

8      43.   Combined L.A./Westside MLS, Inc. ("CLAW") states that it is a leading
9 multiple listing service that serves over 16,000 agents and brokers in Southern
10 California, from Downtown Los Angeles to Pacific Coast Highway. CLAW is a
11 California corporation with headquarters in Beverly Hills, California.

12      44.   California Association of Realtors, Inc. ("California AOR") is
13 headquartered in Los Angeles, California and serves realtors throughout the state of
14 California. California AOR is an NAR affiliate.

15      45.   Greater Los Angeles Realtors, Inc. ("Los Angeles AOR") is
16 headquartered in Culver City, California and serves realtors in the Los Angeles area.
17 Los Angeles AOR is an NAR affiliate.

18      46.   Arcadia Association of Realtors, Incorporated ("Arcadia AOR") is
19 headquartered in Arcadia, California and serves realtors in the Arcadia and San
20 Gabriel Valley, California areas. Arcadia AOR is an NAR affiliate.

21      47.   Burbank Association of Realtors ("Burbank AOR") is headquartered in
22 Burbank, California and serves the realtors in the area. Burbank AOR is an NAR
23 affiliate.

24      48.   Citrus Valley Association of Realtors, Inc. ("Citrus Valley AOR") is
25 headquartered in Glendora, California and serves the realtors in the area. Citrus
26 Valley AOR is an NAR affiliate.

27      49.   Glendale Association of Realtors ("Glendale AOR") is headquartered in
28 Glendale, California and serves the realtors in the area. Glendale AOR is an NAR

affiliate.

50.     Inglewood Board of Realtors, Inc. ("Inglewood BOR") is headquartered in Inglewood, California and serves the realtors in the area. Inglewood BOR is an NAR affiliate.

51.     Montebello District Association of Realtors, Inc. ("Montebello AOR") is headquartered in Montebello, California and serves the realtors in the area. Montebello AOR is an NAR affiliate.

52.     Palos Verdes Peninsula Association of Realtors ("Palos Verdes AOR") is headquartered in Rolling Hills Estates, California and serves the realtors in the area. Palos Verdes AOR is an NAR affiliate.

53.     Pasadena-Foothills Association of Realtors ("Pasadena AOR") is headquartered in Pasadena, California and serves the realtors in the area. Pasadena AOR is an NAR affiliate.

54.     Rancho Southeast Realtors ("Rancho AOR") is headquartered in Cerritos, California and serves the realtors in the area. Rancho AOR is an NAR affiliate.

55.     South Bay Association of Realtors, Inc. ("South Bay AOR") is headquartered in Torrance, California and serves the realtors in the area. South Bay AOR is an NAR affiliate.

56.     Southland Regional Association of Realtors, Inc. ("Southland Regional AOR") is headquartered in Lake Balboa, California and serves realtors in the San Fernando Valley area. Southland Regional AOR is an NAR affiliate.

57.     Tri-Counties Association of Realtors ("Tri-Counties AOR") is headquartered in Walnut, California and serves realtors in the area. Tri-Counties AOR is an NAR affiliate.

58.     West San Gabriel Valley Realtors ("San Gabriel AOR") is headquartered in San Gabriel, California and serves realtors in the area. San Gabriel AOR is an NAR affiliate.

59.     Malibu Association of Realtors, Inc. ("Malibu AOR") is headquartered in Malibu, California and serves realtors in the area. Malibu AOR is an NAR affiliate.

60.     Southwest Los Angeles Association of Realtors ("Los Angeles Southwest AOR") is headquartered in Los Angeles, California and serves realtors throughout Los Angeles. Los Angeles Southwest AOR is an NAR affiliate.

61.     Madera Association of Realtors ("Madera AOR") is headquartered in Madera, California and serves realtors throughout Madera County. Madera AOR is an NAR affiliate.

62.     Fresno Board of Realtors, Incorporated ("Fresno AOR") is headquartered in Fresno, California and serves realtors throughout Fresno County. Fresno AOR is an NAR affiliate.

63.     Merced County Association of Realtors, Inc. ("Merced AOR") is headquartered in Merced, California and serves realtors throughout Merced County. Merced AOR is an NAR affiliate.

64.     Mariposa County Board of Realtors, Inc. ("Mariposa BOR") is headquartered in Mariposa, California and serves realtors throughout Mariposa County. Mariposa BOR is an NAR affiliate.

## **FACTS**

### A.     **Real Estate Market in California**

65.     Most states, including California, have licensing laws that regulate who can represent buyers and sellers in real estate transactions. In 2022, approximately 86% of home sellers and buyers in the United States utilized the services of real estate brokers.[2] These regulations classify real estate professionals into two primary categories: (1) real estate brokers, often referred to as "brokerage firms," and (2) individual real estate licensees or agents. These brokers license and assume legal responsibility for the actions of individual real estate realtors or agents.

---

[2] *See* https://www.nar.realtor/research-and-statistics/quick-real-estate-statistics (last visited Jan. 17, 2024).

66.     In California, only licensed brokers are authorized to receive compensation for representing home buyers or sellers in real estate transactions. Consequently, all real estate brokerage contracts must be established with brokers, not agents, and payments to individual agents or realtors are routed through brokers. Many brokers, along with their respective agents, often operate in dual roles, acting as seller brokers for some property sales and as buyer brokers for others.

67.     In standard residential real estate transactions, brokers and agents receive compensation in the form of commissions, calculated as a percentage of the property's sale price, with the payment being realized upon the sale's completion.

68.     Compensation for seller brokers is stipulated in a listing agreement, a contract signed between the seller and the seller broker. This agreement outlines the listing terms and often grants the seller broker exclusive marketing rights to the property. The listing agreement also specifies the total commission to be paid by the seller.

69.     When a buyer engages a broker's services, they typically enter into a contract with that broker. If a buyer retains a broker, the seller remits the buyer broker's compensation. Historically, NAR's Code of Ethics espoused a conduct standard that falsely suggested to buyers that their agent's services are provided at no cost.

70.     The net effect of these agreements and the Mandatory Offer of Compensation Rule is that buyer brokers, who are tasked with representing the buyers' interests against the sellers, receive their compensation from the overall commission paid by the seller, not from the buyers they represent. This has led to significant confusion regarding the functioning of commissions within the real estate market such that many sellers do not understand how and why they are paying the buyer's agent a 3% commission.

71.     Without the Mandatory Offer of Compensation Rule and in a competitive market context (where sellers have no incentive to compensate a buyer

broker who works against their interests), buyers would directly pay their brokers. Sellers, in turn, would exclusively pay a commission to their seller broker. Consequently, the seller's total broker commission would amount to approximately half or less of the customary commission paid to remunerate both their seller broker and the buyer's broker, who is advocating for the buyer's interests.

**B.** **Role of Multiple Listing Services (MLSs) and the Mandatory Offer of Compensation Rule**

72. MLSs serve as central repositories for available properties within specific geographic areas, offering access to real estate brokers and their affiliated realtors or agents who adhere to MLS regulations. Many MLSs are owned and managed by local realtor associations, which are members of NAR.

73. Several MLSs exist in California,[3] many of which have the same Mandatory Offer of Compensation Rule set forth by NAR.

74. For example, CRMLS effectively adopts NAR's Mandatory Offer of Compensation Rule vis-à-vis CRMLS Rule 17.15(a) which states that: "In placing a listing with the AOR/MLS…the Broker Participant makes a blanket unilateral contractual offer of compensation to the other MLS Broker Participants for their services in selling the property."[4]

75. Likewise, CLAW states in its rules, under the "Purpose" section that "[a] Multiple Listing Service is a means by which authorized MLS Broker participants establish legal relationships with other participants by making a blanket unilateral contractual offer of compensation and cooperation to other Broker participants[.]"[5] CLAW Rule 7.16 also states that "[i]n filing a listing with the AOR/MLS, the Broker Participant makes a blanket unilateral contractual offer of

---

[3] *See* https://mlsimport.com/multiple-listing-services-mls-in-california/ (last visited January 17, 2024); *see also* https://showcaseidx.com/complete-list-of-multiple-listing-services/ (last visited January 17, 2024).

[4] *See* https://go.crmls.org/crmls-rules-and-policies/ (last visited January 17, 2024).

[5] *See* https://forms.themls.com/forms/compliance_manual/CLAW-Rules-and-Regs.pdf (last visited Jan. 17, 2024).

*Footnote continued on next page*

compensation to the other MLS Broker Participants for their services in selling the property."[6]

76.    NAR regulations mandate that seller brokers must list their clients' properties on an MLS. Notably, the failure to list a client's property on an MLS results in diminished visibility for that property, as it is less likely to be presented to potential buyers by buyer brokers.

77.    The Mandatory Offer of Compensation Rule imposes an obligation on seller brokers, acting on behalf of their clients, to make a comprehensive, non-negotiable offer of compensation to buyer brokers whenever they list a property on an MLS affiliated with a local NAR association. In the event that a buyer, who is represented by a broker, ultimately purchases the property, the buyer broker is entitled to the offered compensation.

### C.    **Anticompetitive NAR Rules**

78.    NAR introduced the Mandatory Offer of Compensation Rule in 1996, incorporating it into the Handbook on Multiple Listing Policy. This rule has remained in effect since its inception.

79.    Before the adoption of the Mandatory Offer of Compensation Rule in 1996, upon information and belief, NAR played a central role in structuring, implementing, and enforcing a similar and equally flawed market structure. Under this system of sub-agency, brokers representing buyers were legally obligated to act in the interest of sellers, even when primarily working with buyers. As a result, the practice of sellers compensating both their selling broker and the buyer's broker persisted.

80.    The inefficiency and confusion inherent in this sub-agency system ultimately led to its collapse when widely exposed in the media.

81.    Following the collapse of the sub-agency system, NAR and its co-conspirators devised and enforced an anticompetitive scheme aimed at perpetuating

---

[6] *Id.*

supra-competitive commissions, impeding innovation, and hindering lower-priced competition. This was accomplished through the Mandatory Offer of Compensation Rule, officially adopted in November 1996.

82. NAR's Board of Directors and associated committees periodically evaluate and revise the policies in the Handbook. The Mandatory Offer of Compensation Rule has been retained despite criticism from economists and industry experts, who argue that the rule contributes to anticompetitive market conditions and inflated commission rates.

83. Defendants have actively participated in this anticompetitive scheme by agreeing to follow, promote, and implement the Mandatory Offer of Compensation Rule. These actions have established an environment that perpetuates high commissions and restricts market competition. Indeed, in the Inman Survey (2014), 56% of agents reported that their brokerages require a minimum total commission level to list homes for sellers and brokerages specify a minimum commission rate that must be offered to buyer agents when the brokerages represent the seller.

84. Furthermore, NAR has invited Defendants and other co-conspirators to join an agreement, whereby participation in the MLS system is contingent upon compliance with anticompetitive restraints set forth in the Handbook. Regardless of their initial involvement in drafting or adopting the Mandatory Offer of Compensation Rule, Defendants have since joined the conspiracy and committed to upholding and enforcing the rule.

85. The Handbook explicitly states the Mandatory Offer of Compensation Rule, requiring participants to make unilateral compensation offers when filing properties with an MLS. The Handbook also stipulates that MLSs should not publish listings that do not include compensation offers or invitations for participants to discuss cooperative relationships.

86. The Mandatory Offer of Compensation Rule transfers a cost that would ordinarily be paid by the buyer, in a competitive market, to the seller. Home sellers

effectively become obligated to hire a buyer broker if they want to list their property on an MLS. The system violates antitrust laws by keeping buying agents compensated despite offering limited services. Indeed, in the age of the internet where a buyer is able to search and locate their next house on their computer or smartphone without the assistance of a real estate agent—and they often do just that—a competitive market should have forced lower buyer broker commissions as a reflection of the decreasing need for their services.

87.    In their efforts to steer clients towards homes offering higher commissions, buyer brokers utilize the offered compensation amounts. This steering practice is confirmed by economic literature and has clear anticompetitive effects, making it difficult for brokers to compete based solely on the services they provide to clients.

88.    Defendants and other co-conspirators also employ technology to facilitate steering based on MLS commission information.

**D.    Defendants' Participation in the Conspiracy**

89.    Defendants, in collaboration with NAR, have actively supported, implemented, and enforced the Mandatory Offer of Compensation Rule. They have required their franchisees, brokers, agents, and employees to comply with NAR rules, including the Mandatory Offer of Compensation Rule.

90.    Therefore, Defendants and their franchisees, along with their agents, have furthered the conspiracy by agreeing to implement, follow, and enforce NAR's rules, including the Mandatory Offer of Compensation Rule.

**E.    Effects of the Conspiracy**

91.    The conspiracy led by Defendants and NAR have had several anticompetitive effects in California, including:

- **Inflated Costs and Compelled High Commissions for Home Sellers**: The Defendants' conspiracy in California has resulted in inflated costs for home sellers. They are compelled to pay commissions to buyer brokers who, paradoxically, represent their adversaries in property negotiations. This

practice also compels home sellers to set high buyer broker commissions, which in turn diminishes their control over expenses and market competitiveness.

- **Payment of Inflated Commissions and Price Competition Restraint**: The conspiracy perpetuates the payment of inflated buyer broker commissions and total commissions by home sellers, reducing the financial benefit sellers derive from property transactions. This anticompetitive conduct significantly restrains price competition among brokers in California. Both buyers seeking to retain broker services and sellers seeking to list their properties find their choices constrained by this manipulative environment.

- **Separation of Buyer Broker Retention and Commission Setting**: The conspiracy has effectively separated the retention of buyer brokers from the setting of broker commissions. In this distorted system, the home buyer now directly retains the services of a buyer broker, while the seller's agent determines the compensation for the buyer broker, exacerbating inefficiencies within the market.

92.     There are no pro-competitive effects stemming from the conspiracy, which is unequivocally anticompetitive and detrimental to the competitive landscape. And any alleged pro-competitive benefits within the MLS system do not justify the Mandatory Offer of Compensation Rule, as they are substantially outweighed by its anticompetitive effects including restraining price competition and encouraging steering.

93.     Comprehensive economic evidence supports the notion that the conspiracy has resulted in inflated total commissions and buyer broker commissions paid by home sellers, far exceeding what a competitive market would dictate.

94.     In comparison to other countries with competitive real estate markets, commission rates in the United States are significantly higher, including in California where the average commission falls between 5-6%.[7] This high commission rate prevails in the face of the realities of modern home buying where many buyers find

---

[7] *See* https://www.fastexpert.com/blog/real-estate-commission-rate-in-california/ (last visited Jan. 17, 2024).

by themselves the homes they ultimately purchase on the internet, a fact that should have radically driven down the cost of a buyer's agent's fee. Nonetheless, a large majority (73%) of agents say they will not negotiate their commissions, a stance that would be untenable in a competitive market.[8]

F.   **Defendants' Market Power in Relevant California Counties**

95.   The relevant market for the claims herein is the bundle of services provided to home buyers and sellers by residential real estate brokers with access to MLSs. Defendants' control of MLSs allows them to impose anticompetitive NAR rules on Class members and other market participants.

96.   The relevant geographic market for the claims are the following California counties: Madera County, Fresno County, Merced County, and Mariposa County (the "Central Counties"); and Los Angeles County. The vast majority of homes sold in these counties were listed on MLSs by brokers subject to NAR regulations, including the Mandatory Offer of Compensation Rule or its functional equivalent.

97.   Defendants and their co-conspirators collectively possess significant market power within each relevant market. Their influence is achieved through their participation and control over local MLSs and their substantial share of the local market.

98.   Non-conspiring brokers who aim to compete outside the conspiracy face insurmountable barriers:

- Access to MLSs is essential for brokers to effectively serve buyers and sellers in the market.
- An alternative listing service aiming to compete with an MLS would require listings that are as comprehensive as an MLS, but brokers within the conspiracy lack the incentive to participate in such a service.
- Home buyers and sellers would be reluctant to utilize a new alternative listing service without a proven track record.

[8] *See* https://www.cnbc.com/2019/10/30/realtor-commissions-are-not-negotiable.html (last visited Jan. 17, 2024).

- NAR advises MLSs to enter into non-compete agreements with third-party websites.

**G.  Continuous Accrual**

99.   Over the course of the last four years leading up to the filing of this Complaint, Defendants, in collaboration with brokers operating within MLS-covered regions, systematically applied and received buyer broker commissions and total commissions at inflated rates, all due to their ongoing conspiracy. During this timeframe, Plaintiffs and other members of the Class were obliged to remit these inflated commissions in conjunction with the sale of residential real estate listed on MLSs. Each such payment over the past four years resulted in harm to Plaintiffs and their fellow Class members, giving rise to new causes of action stemming from these injuries.

100.   Throughout the preceding four years, Defendants, alongside their co-conspirators, have consistently upheld, executed, and enforced the Mandatory Offer of Compensation Rule and various other anticompetitive NAR directives on a nationwide scale.

## CLASS ACTION ALLEGATIONS

101.   Plaintiff Fierro brings this action on behalf of himself, and as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of the members of the Class defined as:

> All persons in Los Angeles County who, from January 17, 2020, through the present, used any Defendant or their affiliates as the listing broker in the sale of a property listed on an MLS, and who paid a commission to the buyer's broker in connection with the sale of the property (the "Los Angeles County Class").

102.   Excluded from the Class are Defendants, their officers, directors and employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officer(s) presiding over this action and the members of his/her/their

immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firms.

103.   Plaintiff Thurber brings this action on behalf of himself, and as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of the members of the Class defined as:

> All persons in the Central Counties, who, from January 17, 2020, through the present, used any Defendant or their affiliates as the listing broker in the sale of a property listed on an MLS, and who paid a commission to the buyer's broker in connection with the sale of the property (the "Central Counties Class").

104.   Excluded from the Class are Defendants, their officers, directors and employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firms.

105.   The Classes are readily ascertainable because records of the relevant transactions exist.

106.   Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the Classes have many thousands of members, the exact number and their identities being known to Defendants and their co-conspirators.

107.   Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.

108.   Common questions of law and fact exist as to all members of the Classes and predominate over any question affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

a. Whether Defendants engaged in the alleged conspiracy;

b. Whether the conduct of Defendants' and their co-conspirators caused injury to the business or property of Plaintiffs and the other members of the Classes;

c. Whether the effect of Defendants' conspiracy was to inflate both total commissions and buyer broker commissions;

d. Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

e. Whether Defendants' conduct is unlawful; and

f. The appropriate class-wide measures of damages.

109. Plaintiffs' claims are typical of the claims of the members of the Classes because their claims arise from the same course of conduct by Defendants and the relief sought within the Classes is common to each member.

110. Plaintiffs have retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent themselves and the Classes. Together Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of the Classes. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

111. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Classes would impose heavy burdens on the Court and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Classes. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the members of the Classes to seek redress for the violations of law alleged herein.

112.   Additionally, the Classes may be certified under Rule 23(b)(1) and/or (b)(2) because:

g.   The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

h.   The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

i.   Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## **ANTITRUST INJURY**

113.   Defendants' anticompetitive agreements and conduct have had the following effects, among others:

j.   Sellers of residential property have been forced to pay inflated costs to sell their homes through forced payments of commissions to buyer brokers;

k.   Home sellers have been faced with the fear of steering, such that they set buyer broker commissions to induce  buyer brokers to show the sellers' homes to prospective buyers;

l.   Price competition has been restrained among brokers seeking to be retained by home buyers, and by brokers seeking to represent home sellers; and

m.   Defendants and their franchisees and subsidiaries have inflated their profits by a significant margin by the increased total

1    commissions and increased buyer broker commissions.

2    114. By reason of the alleged violations of the antitrust laws, Plaintiffs and

3    the Classes have sustained injury to their businesses or property, having paid higher

4    total commissions than they would have paid in the absence of Defendants'

5    anticompetitive conspiracy, and as a result have suffered damages.

6    115. There are no pro-competitive effects of Defendants' conspiracy that are

7    not substantially outweighed by the conspiracy's anticompetitive effects.

8    116. Significant economic evidence supports concluding that Defendants'

9    conspiracy has resulted in Class members paying buyer broker commissions and total

10   commissions that have been inflated to a supra-competitive level.

11   117. This is an antitrust injury of the type that the antitrust laws were meant

12   to punish and prevent.

### CAUSES OF ACTION

### COUNT 1
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

16   118. Plaintiffs repeat and incorporate by reference each paragraph above and

17   in any other count of this Complaint.

18   119. Plaintiff Fierro brings this action on behalf of himself and the Los

19   Angeles County Class against Defendants NAR, The Agency, Compass, eXp, eXp

20   California, eXp SoCal, eXp Los Angeles, Berkshire Hathaway, BHHS, First Team,

21   Rodeo Realty, Pinnacle, CRMLS, CLAW, California AOR, Los Angeles AOR,

22   Arcadia AOR, Burbank AOR, Citrus Valley AOR, Glendale AOR, Inglewood BOR,

23   Montebello AOR, Palos Verdes AOR, Pasadena AOR, Rancho AOR, South Bay

24   AOR, Southland Regional AOR, Tri-Counties AOR, San Gabriel AOR, Malibu

25   AOR, and Southwest Los Angeles AOR.

26   120. Plaintiff Thurber brings this action on behalf of himself and the Central

27   Counties Class against Defendants NAR, CRMLS, The Agency, Compass, eXp, eXp

28   California, eXp NorCal, Berkshire Hathaway, BHHS, Fresno AOR, Madera AOR,

Merced AOR, and Mariposa BOR.

121.   Beginning more than four years before the filing of this Complaint, and continuing into the present, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

122.   The conspiracy alleged herein consists of a continuing agreement among Defendants and Defendants' co-conspirators to require sellers of residential property to make inflated payments to the buyer broker.

123.   In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

n.   Participated in the creation, maintenance, re-publication, and implementation of the Mandatory Offer of Compensation Rule and other anticompetitive NAR rules;

o.   Participated in the establishment, maintenance, and implementation of rules by local NAR associations and MLSs that implemented the Mandatory Offer of Compensation Rule and other anticompetitive NAR rules; and

p.   Requiring franchisees of Defendants and others to implement the Mandatory Offer of Compensation Rule and other anticompetitive NAR rules, which each Defendant does through its franchise agreements, policy manuals, and other contracts with its franchisees, affiliates, subsidiaries, and realtors.

124.   Defendants' conspiracy has required sellers to pay buyer brokers, to pay an inflated buyer broker commission and an inflated total commission, and it has restrained price competition among buyer brokers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

125.   Defendants' conspiracy has caused buyer broker commissions and total commissions to be inflated. Plaintiffs and the other members of the Classes paid these

inflated commissions during (and before) the last four years in connection with the sale of residential real estate. Absent Defendants' conspiracy, Plaintiffs and the other Class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer.

126.   Defendants' conspiracy is a *per se* violation under the federal antitrust laws, specifically 15 U.S.C. § 1.

127.   In the alternative, Defendants' conspiracy is illegal under the federal antitrust laws and violates 15 U.S.C. § 1 under a rule-of-reason analysis.

128.   As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs and the other Class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

<u>**COUNT 2**</u>
**Violation of the Cartwright Act, California Business & Professions Code §§ 16720 et. seq.**

129.   Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

130.   Plaintiff Fierro brings this action on behalf of himself and the Los Angeles County Class against Defendants NAR, The Agency, Compass, eXp, eXp California, eXp SoCal, eXp Los Angeles, Berkshire Hathaway, BHHS, First Team, Rodeo Realty, Pinnacle, CRMLS, CLAW, California AOR, Los Angeles AOR, Arcadia AOR, Burbank AOR, Citrus Valley AOR, Glendale AOR, Inglewood BOR, Montebello AOR, Palos Verdes AOR, Pasadena AOR, Rancho AOR, South Bay AOR, Southland Regional AOR, Tri-Counties AOR, San Gabriel AOR, Malibu AOR, and Southwest Los Angeles AOR.

131.   Plaintiff Thurber brings this action on behalf of himself and the Central Counties Class against Defendants NAR, CRMLS, The Agency, Compass, eXp, eXp California, eXp NorCal, Berkshire Hathaway, BHHS, Fresno AOR, Madera AOR, Merced AOR, and Mariposa BOR.

132.   Defendants' conduct constitutes and continues to be an unreasonable restraint of trade of commerce in violation of the Cartwright Act, California Business & Professions Code §§ 16720 et. seq.

133.   Defendants have unlawfully restrained competition by adopting the Mandatory Offer of Compensation Rule.

134.   By adopting and implementing the Mandatory Offer of Compensation Rule, Defendants unlawfully restrain trade by causing sellers of homes to pay inflated commissions, requiring sellers of homes to pay a cost that, in a competitive market, would be paid by the home seller, and preventing home buyers or their brokers to reduce brokers' commissions by making that reduction conditional of a purchase offer.

135.   Defendants' unlawful restraint of trade has caused and continues to cause buyer-broker commissions and total commissions paid by home sellers in Los Angeles and Central Counties to be higher than they would have been but for the conspiracy, and thus substantially affects California commerce. Plaintiffs and Class Members paid these inflated commissions in connection with the sale of residential real estate listed on MLSs in Los Angeles County and Central Counties.

136.   The anticompetitive effects of Defendants' conduct outweighs any procompetitive justification.

137.   Plaintiffs and Class members have suffered injury and lost money because of Defendants' violations of law and wrongful conduct, for which they seek damages, including treble damages where appropriate, including pre-judgment interest.

138.   Defendants' conduct is continuing and unless equitable relief is granted, inflated commission rates will continue and cause harm.

## COUNT 3
### Violation of the California's Unfair Competition Law, California Business & Professions Code §§ 17200 et. seq.

139.   Plaintiffs repeat and incorporate by reference each paragraph above and

in any other count of this Complaint.

140.   Plaintiff Fierro brings this action on behalf of himself and the Los Angeles County Class against Defendants NAR, The Agency, Compass, eXp, eXp California, eXp SoCal, eXp Los Angeles, Berkshire Hathaway, BHHS, First Team, Rodeo Realty, Pinnacle, CRMLS, CLAW, California AOR, Los Angeles AOR, Arcadia AOR, Burbank AOR, Citrus Valley AOR, Glendale AOR, Inglewood BOR, Montebello AOR, Palos Verdes AOR, Pasadena AOR, Rancho AOR, South Bay AOR, Southland Regional AOR, Tri-Counties AOR, San Gabriel AOR, Malibu AOR, and Southwest Los Angeles AOR.

141.   Plaintiff Thurber brings this action on behalf of himself and the Central Counties Class against Defendants NAR, CRMLS, The Agency, Compass, eXp, eXp California, eXp NorCal, Berkshire Hathaway, BHHS, Fresno AOR, Madera AOR, Merced AOR, and Mariposa BOR.

142.   Plaintiffs, the members of the Classes, and Defendant are a "person" or "persons," within the meaning of Section 17201 of the California Unfair Competition Law ("UCL").

143.   Defendants have engaged in unfair competition within the meaning of California Business & Professions Code section 17200, et seq., because Defendant's conduct, as described herein, violated the California Cartwright Act and the Sherman Antitrust Act.

144.   Thus, Defendants violated the UCL's unlawful and unfair prongs.

145.   Additionally, these unfair acts and practices were immoral unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class members. Defendants' practices were also contrary to legislatively declared and public policies.

146.   Plaintiffs have standing to pursue this claim because they have been injured by virtue of the wrongful conduct alleged herein.

147.   The Unfair Competition Law is, by its express terms, a cumulative

remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes and/or common law remedies, such as those alleged in the other Counts of this Complaint. *See* Cal. Bus. & Prof. Code § 17205.

148.   As a direct and proximate cause of Defendants' conduct, which constitutes unlawful and unfair business practices as alleged herein, Plaintiffs and Class Members have been damaged and suffered ascertainable losses.

149.   Plaintiffs and Class members are thereby entitled to recover restitution and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this class action, as well as any and all other relief that may be available at law or equity.

## JURY DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a jury trial of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request relief and pray for judgment against Defendants as follows:

a.   An Order certifying the Class under the appropriate provisions of Rule 23 of the Federal Rule of Civil Procedure, and appointing Plaintiff Fierro to represent the Los Angeles County Class, Plaintiff Thurber to represent the Central Counties Class, and their counsel to represent the Classes;

b.   Declarations that the actions of Defendants, as set forth above, are unlawful;

c.   A permanent injunction under Section 16 of the Clayton Act enjoining Defendants from (1) requiring that sellers pay the buyer broker, (2) continuing to restrict competition among buyer brokers and seller brokers, and (3) engaging in any conduct determined to be unlawful;

d.     Appropriate injunctive and equitable relief;

e.     An award to Plaintiffs and the other members of the Classes for damages and/or restitution in an amount to be determined at trial;

f.     An award of pre- and post-judgment interest to Plaintiffs;

g.     An award to Plaintiffs for their costs of suit, including reasonable attorneys' fees and expenses;

h.     An award of such other relief as the Court may deem just and proper.

Respectfully submitted,

DATED: January 17, 2024          **KAPLAN FOX & KILSHEIMER LLP**

By:  /s/ *Matthew B. George*
          Matthew B. George

Matthew B. George (SBN 239322)
Blair E. Reed (SBN 316791)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone:  415-772-4700
Facsimile:   415-772-4707
Email: *mgeorge@kaplanfox.com*
          *breed@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox (*pro hac vice* forthcoming)
Jeffrey P. Campisi (*pro hac vice* forthcoming)
Matthew P. McCahill (*pro hac vice* forthcoming)
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: *ffox@kaplanfox.com*
          *jcampisi@kaplanfox.com*
          *mmccahill@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Justin B. Farar (SBN 211556)
12400 Wilshire Boulevard, Suite 460
Los Angeles, CA 90025
Telephone: 310-614-7260
Facsimile: 310-614-7260
Email: jfarar@kaplanfox.com

**THE PETTIT LAW FIRM**
Julie Pettit (*pro hac vice* forthcoming)
David B. Urteago (*pro hac vice* forthcoming)
2101 Cedar Springs, Suite 1540
Dallas, Texas 75201

Telephone: (214) 329-0151
Facsimile: (214) 329-4076
Email: *jpettit@pettitfirm.com*
      *durteago@pettitfirm.com*

**LYNN PINKER HURST & SCHWEGMANN, LLP**
Michael K. Hurst (*pro hac vice* forthcoming)
Chris Schwegmann (*pro hac vice* forthcoming)
Yaman Dasai (*pro hac vice* forthcoming)
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839
Email: *mhurst@lynnllp.com*
      *cschwegmann@lynnllp.com*
      *ydesai@lynnllp.com*

*Attorneys for Plaintiffs and the Proposed Classes*